**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| REACT ENVIRONMENTAL PROFESSIONAL | : | |
| SERVICES GROUP, INC., *et al.,* | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil No. 2:20-cv-00533-JMG |
| | : | |
| JON P. BUZAN, *et al.,* | : | |
| Defendants. | : | |

_____

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                        **August 13, 2021**

Business breakups beget bad blood.  That is certainly the case here, as Plaintiffs REACT

Environmental Professional Services Group, Inc. and Jerry F. Naples, Jr. allege that their former

business partner, Defendant Jon P. Buzan, misappropriated trade secrets when he left for a

competing company, Defendant CDS Capital Management, L.C.  Defendants request summary

judgment on each of Plaintiffs' claims and move to strike language in Plaintiffs' opposition

briefing.  Plaintiffs, who have alleged spoliation throughout this litigation, move for sanctions.

For the following reasons, summary judgment will be granted in Defendants' favor.  We will also

grant the motion to strike and deny Plaintiffs' motion for sanctions.

**I.      FACTUAL BACKGROUND**

**A.      Introduction**

At its core, this case is about a business relationship gone wrong.  Defendant Jon P. Buzan

and Plaintiff Jerry F. Naples, Jr. once worked together at REACT Environmental Professional

Services Group, Inc. ("REACT"), a company that provides "consulting services to buyers and

potential buyers and owners of real estate as to the remediation and revitalization of

environmentally troubled real estate." Compl. ¶ 2, ECF No. 1. Naples founded the company; Buzan was its CEO. *Id.* ¶¶ 5, 11.

On May 30, 2008, Buzan and Naples entered a Stockholders' Agreement (the "Agreement"). *Id.* ¶ 9. In exchange for 50% of REACT's shares, Buzan agreed to a comprehensive non-compete clause:

> Covenant Not To Compete. Stockholder/employee agrees that he shall not, at any time, while he is employed by the Corporation pursuant to this Agreement, or any time thereafter, for a period of two (2) years following his termination of employment, either directly or indirectly, whether as agent, Stockholder, employee, officer, director, trustee, partner, proprietor or otherwise, except as the holder of not more than five percent (5%) of the stock of a publicly held company, provided employee does not participate in the business of such Corporation or render advice or assistance to it:
>
> a. Engage in or render advice or assistance to, other than on behalf of the Corporation, any business within one hundred (100) miles of any office of the Corporation . . . .
>
> b. Divert or attempt to divert any business whatsoever from the Corporation or entice or attempt to entice any of the customers of the Corporation so as to cause any of such customers not to do business with the Corporation.
>
> c. Disclose to any person who is not, at the time of such disclosure, an employee or licensee of the Corporation . . . the name and address of, or any information concerning any customer of the Corporation or any confidential information regarding the Corporation's business obtained while in the employ of the Corporation.
>
> d. Divert or attempt to divert or entice or attempt to entice any employee of the Corporation to cease employment with the Corporation.

App. vol. 2, 135–36, ECF No. 78-2. The Agreement later became the subject of a suit in Pennsylvania state court, the significance of which will be explained below. *See id.* at 111–15.

By 2015, the parties' relationship began to sour. Compl. ¶ 11. Naples believed that Buzan was not driving the company in a positive direction and was not bringing in "big whale[s]." App.

vol. 1, 67–69, ECF No. 78-1.  He ultimately blamed Buzan for the company's lack of profitability.
*Id.* at 66.

On January 18, 2019, Naples sued Buzan in the Philadelphia Court of Common Pleas.
App. vol. 2, 107–40.  Alleging that Buzan had "not paid for 50% of the shares of" REACT, Naples
requested that the Court declare:

> a.   That Buzan is in breach of the [Agreement] . . .;
>
> b.   That any opportunity to cure such breach as [*sic*] expired;
>
> c.   That Naples is the sole, or majority shareholder of the issued and
>      outstanding stock of [REACT];
>
> d.   That the [Agreement] is ***void ab initio***.

*Id.* at 112–13 (emphasis added); *see also id.* at 150 ("It is denied that Buzan ever became or
continues to be a 50% owner of [REACT].  To the contrary, he did not and is not.").[1]  Buzan filed
a counterclaim, but ultimately withdrew it, deciding instead to end his employment with REACT.
*See* Def.'s Statement of Facts ¶ 11, ECF No. 78 [hereinafter "DSOF"].  On July 26, 2019, Buzan
resigned from REACT.  *See id.* ¶ 12.

On or about July 29, 2019, CDS Capital Management, L.C. ("CDS") hired Buzan.  *Id.* ¶
13.   CDS owns Comstock Environmental ("Comstock"), "a professional environmental
engineering and consulting firm for environmental assessment and remediation."   *Id.* ¶ 4.
Comstock and REACT are competitors.  Compl. ¶ 13.

Comstock's general counsel, Jubal Thompson, thoroughly vetted Buzan before the hiring.
DSOF ¶ 15.  At a minimum, Thompson reviewed the Pennsylvania state court complaint "with
Buzan's litigation counsel and two law firms . . . to understand Comstock's responsibilities with

---

[1]      Naples was deposed in that separate litigation.  He maintained that the "all of the terms [of
the Agreement] are void."  App. vol. 1, 79–80.

respect to Pennsylvania law as it related to the [Agreement] and the state lawsuit." *Id.* Thompson credited the complaint's request to declare the Agreement void *ab initio*. *Id.* ¶ 16; *see also* App. vol. 2, 157 ("In permitting CDS's hire of Mr. Buzan, I relied in part on [the state court complaint's] sworn statements that the [Agreement] was void *ab initio* . . . ."). He separately believed that the Agreement's non-compete clause was unenforceable as a matter of law. DSOF ¶ 16. Nevertheless, prior to the hiring, "no one at CDS discussed Buzan's client book or any specific clients with him." *Id.* ¶ 14. And once Buzan was hired, Thompson and CDS repeatedly "instructed Buzan not to solicit any REACT customers or employees." *Id.* ¶¶ 17–18.

In sum, Plaintiffs take issue with three events: (1) Buzan's alleged misappropriation of trade secrets and Naples' personal information; (2) Buzan's alleged recruitment of REACT employees to Comstock; and (3) Buzan's alleged spoliation of electronically stored information ("ESI"). These episodes will be described in turn.

### B.    Misappropriation of Trade Secrets and Personal Information

On July 31, 2019, Naples emailed REACT's entire customer list, "informing them that Buzan had left REACT and gone to work at a different company." *Id.* ¶ 28. One of those customers was Israel Roizman. *Id.* ¶ 31. Roizman had been working with Buzan, so he called Naples to discuss the situation. *Id.* Naples did not return the call. *Id.* ¶ 32.

The parties dispute what happened next. Defendants maintain that Roizman called Buzan and requested a meeting to discuss a project (the "Roizman Project"). *Id.* ¶¶ 33–34.[2] On the other hand, Plaintiffs insist that Roizman's "contact with Comstock was initiated by Buzan." Pls.' Resp.

---

[2]    Phone records and Buzan's testimony support this version of events. *See* App. vol. 2, 166 (phone records showing a call between Buzan and Roizman on July 31, 2019); App. vol. 1, 20 ("I believe [Roizman] called me on July 31st within two hours of the e-mail blast that I described from Jerry Naples.").

to Def.'s Statement of Facts ¶ 31, ECF No. 80-3 [hereinafter "PRSOF"].[3]

Regardless, before engaging Roizman as a client, "Thompson personally contacted Roizman's counsel to confirm the facts and circumstances surrounding Roizman's contact with Buzan.  Roizman's counsel verified . . . that Roizman had not been solicited and that he had independently and unilaterally reached out to Buzan."  DSOF ¶ 36.  On August 3, 2019, Comstock and Roizman entered a Consultant Agreement for the Roizman Project.  *Id.* ¶ 37; *see also* App. vol. 2, 168.

The problem, though, is that REACT previously submitted a proposal for the Roizman Project.  *See* App. vol. 2, 209–13 (REACT proposal dated April 5, 2019).  It directly mirrors the proposal that Comstock submitted in August 2019.  *Compare id.*, *with id.* at 202–06.  For example, they share the same language and pricing.  *Compare id.* at 211, *with id.* at 204.

Plaintiffs allege that, the day before his resignation, Buzan downloaded REACT's Roizman Project proposal to his company-issued laptop, along with "highly confidential and personal financial information of Mr. Naples and of his family."  Compl. ¶¶ 14–15, 17.  Moreover, about one week before his resignation, Buzan allegedly "transferred his [REACT] Verizon cellphone number over to his personal account, thereby allowing himself access to REACT's business and customers on a continuing basis."  *Id.* ¶ 25.

Plaintiffs demanded that Buzan "return REACT's laptop computer and cellphone but he delayed doing so for several days, during which he began employment with Comstock."  *Id.* ¶ 19.  When Buzan finally returned his REACT devices, Plaintiffs submitted them to Maragell, LLC ("Maragell"), for forensic examination.  *See id.* ¶ 20.  Maragell's findings were memorialized in a

---

[3]     The testimony cited for this proposition is equivocal at best.  Roizman did not remember "exactly how" he learned of Buzan's new employment with Comstock.  Pls.' Mem. Ex. Q, at 50, ECF No. 80-2.  He thought Buzan "came and told us that he is capable of doing the work."  *Id.*

report dated January 16, 2020 (the "Maragell Report").  *See* App. vol. 2, 214–20 (opening pages of the Maragell Report).  The contents of the Maragell Report will be summarized below, in Section I.D.

### C.    Recruitment of Chelsie Johnston[4]

In addition to misappropriating information from REACT, Buzan allegedly recruited one of its employees, Chelsie Johnston, to Comstock.  *See* Compl. ¶ 53.  Johnston was an administrative assistant at REACT.  DSOF ¶ 20.

On July 30, 2019, shortly after contacting Buzan,[5] Johnston submitted her two weeks' notice.  *Id.* ¶ 22.  Once Thompson caught wind of this development,[6] he declined to hire Johnston "out of an abundance of caution."  *Id.* ¶ 23.  "Only after attempting to ensure that there was no solicitation by Buzan and that Johnston approached Buzan for employment, did Thompson consider the hiring of Johnston."  *Id.* ¶ 24.

To that end, Johnston submitted an affidavit in September 2019, stating that she left REACT because "1) the management of [REACT] negatively modified [her] job responsibilities and prevented [her] from accessing [her] normal passwords and administrative rights; and 2) [REACT's] management acted unprofessionally and accusatory towards [her] upon the departure

---

[4]    Plaintiffs also allege that Buzan improperly recruited William Chaykin, a former REACT project manager, to Comstock.  *See* Pls.' Mem. Ex. T, ECF No. 80-2.  Defendants do not address this point in their motion, so we limit our summary to Johnston's alleged recruitment.

[5]    Buzan testified that Johnston called him the "Tuesday after [he] had left" REACT.  App. vol. 1, 14–15.  Buzan left REACT on July 26, 2019, a Friday.  DSOF ¶ 12.  That means Johnston called Buzan and submitted her two weeks' notice on the same day: Tuesday, July 30, 2019.

[6]    Buzan apparently lobbied his superiors to hire Johnston.  *See* App. vol. 1, 15 ("Q. Did you tell her that she should come work for Comstock?  A.  I didn't have the authority to tell her to come work at Comstock.  I would have pitched it to my superiors.  Q.  Did you pitch it to your superiors?  A.  Absolutely.").

of Jon Buzan from the company."  App. vol. 2, 160.  She further affirmed that she "was not encouraged to leave, or diverted from, [her] employment at [REACT] by Jon Buzan, or any employee of [Comstock]."  *Id.*  Buzan similarly affirmed that he "did not initiate any affirmative or passive actions to either divert, attempt to divert, or entice, or attempt to entice, [Johnston] to cease employment with [REACT]."  *Id.* at 162.

In reliance on these affidavits, Comstock hired Johnston on September 18, 2019.  DSOF ¶ 27.[7]

### D.     Spoliation

For the most part, allegations of spoliation animate this case.  Since the issuance of the Maragell Report, Plaintiffs have continuously asserted that Buzan confiscated and then destroyed ESI.  Below is an outline of the relevant events.

### i.     *Maragell Report*

On August 21, 2019, Maragell received Buzan's laptop and cellphone from REACT.  App. vol. 2, 215.  After forensically examining the devices, Maragell concluded that Buzan:

> a.  Copied his React Outlook email account (containing approximately 1.5 years' worth of mail).  The emails within the account contained attachments pertaining to several projects React was actively pursuing.
>
> b.  Copied and accessed the personal files belonging to React's President to the Buzan laptop, and then deleted them, together with many of React's company files, on his last day of work by sending them to the Recycle Bin.[8]

---

[7]     Plaintiffs do not dispute these allegations in their counterstatement of facts.

[8]     The Maragell Report acknowledges that Johnston may have accessed these files for Buzan.  Naples' personal files were in a password-protected folder, and Johnston "had access to the folder by default as the administrator."  App. vol. 2, 218.

    c.  Inserted three additional external USB storage devices into the Buzan laptop on his last day of work, thereby giving him the opportunity to copy additional files off of the Buzan laptop.

    d.  Accessed his Gmail account on multiple occasions between his last day of work and August 8, 2019 prior to returning the Buzan laptop, which provided him with yet another opportunity to exfiltrate React's property.

    e.  Factory reset his company iPhone, thereby permanently deleting all its contents.

*Id.* at 219–20.

    *ii.*    *Lacey Walker and Device Production*

In November 2020, we directed the parties to "agree upon a single computer forensic expert for all forensic computer fact purposes in this case." Order 1, ECF No. 38. We also ordered Defendants to "make available to such expert for forensic copying and evaluation, each and every smart phone, cell phone, desktop computer, laptop computer, electronic notebook and electronic data storage device . . . which at any time . . . Buzan . . . owned or used, for business purposes, during his employment with REACT . . . and/or his employment with CDS . . . and on which he placed or stored any business information, including, without limitation, telephone numbers and/or contact information of customers and potential customers of REACT." *Id.* at 1–2.

The parties retained Lacey Walker as the neutral forensic expert. Pls.' Mem. Ex. R, at 2, ECF No. 80-2. Walker examined five of Buzan's devices—a laptop,[9] an external hard drive, an iPhone, and two iPads—"for activities involving the allegation of misappropriation of confidential business information." *Id.* He issued his first report on February 15, 2021 (the "First Walker Report"). *Id.*

---

[9]    This is not the same laptop that was examined in the Maragell Report. Walker inspected a Microsoft Surface laptop; Maragell examined an HP ZBook. *Compare* Pls.' Mem. Ex. R, at 2, *with* App. vol. 2, 215.

Walker concluded that the laptop's operating system "was installed or reinstalled on November 19, 2020." *Id.* at 3.  This prevented Walker from identifying all the "USB devices [that] were attached to the computer." *Id.*  Nevertheless, he identified three USB devices that were attached to the laptop:

| Volume Label | Created | Modified | Accessed |
|---|---|---|---|
| Seagate Backup Plus Drive | 8/2/2019 1:10:20 PM | 8/2/2019 2:50:29 PM | 8/2/2019 |
| USB20FD | 7/22/2019 2:10:15 PM | 7/22/2019 2:10:16 PM | 7/22/2019 |
| FUJIFILM | 7/17/2018 2:41:02 PM | 7/17/2018 2:41:04 PM | 4/2/2019 |

*Id.* at 4.  He also detected content that "was copied from the laptop to the . . . external hard drive," as well as "deleted content on both the laptop and external hard drive." *Id.* at 6.

The First Walker Report prompted a wave of motion practice by Plaintiffs.  In their estimation, the First Walker Report "establishe[d] that information which Mr. Buzan clearly obtained while he was the Chief Executive Officer of REACT found its way onto Comstock's computer."  Letter 1, ECF No. 45.  To that end, Plaintiffs requested further investigation.  They found support in the Court's January 31, 2020 order, which instructed Defendants not to "destroy, discard, overwrite, or alter any electronically stored material which refers or relates to Jon Buzan, Jerry F. Naples, Jr., and/or REACT . . . or a REACT customer known as 'Roizman,' on any computer, cellphone, or electronic storage device owned or in the possession, custody, and control of defendants, or anyone acting in concert with them."  Order, ECF No. 4.  Plaintiffs argued that Buzan violated this order by overwriting his laptop's operating system in November 2020.  Letter 2, ECF No. 45.

Over Defendants' objections, *see* Letter, ECF No. 51, we ordered Walker "to conduct further investigation."  Order, ECF No. 55.

At the same time, Plaintiffs argued that Buzan failed to provide Walker "all storage devices that [he] used for business while employed by either Plaintiff or Comstock."  Letter 2, ECF No.

54.  Though Buzan affirmed that he did so, Plaintiffs challenged the veracity of this statement.  *See*

Letter 2, ECF No. 54 ("It is clear that those Certifications are false.").  Plaintiffs' argument focused

on the interaction between the Maragell Report and the First Walker Report.  The Maragell Report

identified eight storage devices that Buzan inserted into his REACT-issued laptop:[10]

| Description | First Connected (EST/EDT) | Last Connected (EST/EDT) |
| --- | --- | --- |
| USB DISK 2.0 USB Device | 07/26/2019 01:33:37 PM | 07/26/2019 01:33:42 PM |
| USB DISK 2.0 USB Device | 07/26/2019 01:31:30 PM | 07/26/2019 01:33:22 PM |
| Generic Flash Disk USB Device | 07/26/2019 01:30:08 PM | 07/26/2019 01:30:09 PM |
| Verbatim STORE N GO USB Device | 06/14/2018 02:39:06 PM | 06/14/2018 02:39:08 PM |
| Verbatim STORE N GO USB Device | 07/10/2019 01:40:40 PM | 07/10/2019 01:40:42 PM |
| Seagate BUP Slim BK SCSI Disk Device | 08/02/2019 11:11:45 AM | 08/08/2019 02:17:01 PM |
| HP OFFICEJET 6500 E | | |
| PNY USB 2.0 FD | | |
| LEXAR USB FLASH DRIVE | | |

*See* Br. Ex. B, at 24, ECF No. 66-2.  However, for purposes of the First Walker Report, Buzan

surrendered *only* the Seagate hard drive for examination—he did not produce the other seven USB

devices identified by Maragell.  *See* Letter 2, ECF No. 54 ("The neutral expert's report states that

defendants gave to him only three storage devices and of those three, only one is included in the

eight defendant Buzan used when employed by Plaintiff.").

Buzan subsequently submitted another affidavit, reiterating that he does "not know the

whereabouts of any USB devices which have been identified in [the Maragell Report] and which

have not already been produced."  Buzan Aff. ¶ 13, ECF No. 66-1.  He further affirmed that he did

"not place or store any business information" on the two "USB DISK 2.0 USB Devices"[11] and one

"Generic Flash Disk USB Device" identified in the Maragell Report.  *Id.* ¶¶ 6, 10.  In reliance on

this affidavit, we rejected Plaintiffs' request to reopen Buzan's deposition, and instead allowed

---

[10]     Notably, two of these devices were last used in 2018, well before Buzan allegedly misappropriated REACT's trade secrets.

[11]     Buzan hypothesizes that he attempted to download "Quicken files" on one of these devices. Buzan Aff. ¶¶ 8–9, ECF No. 66-1.  His Quicken account contained information about his "personal finances."  Pls.' Mem. Ex. B, at 113, ECF No. 80-1.

Plaintiffs to serve additional interrogatories.  *See* Pls.' Mem. Ex. V, ECF No. 80-2 (Buzan's objections and responses to the additional interrogatories).

Meanwhile, Walker prepared his supplemental forensic report (the "Second Walker Report").  Pls.' Mem. Ex. S, ECF No. 80-2.  Walker "did not observe any evidence that suggested that [Buzan] initiated the [operating system] updates" on his Microsoft Surface laptop.  *Id.* at 3. He also "analyzed the laptop in order to identify any evidence of file wiping or data destruction" and "did not observe any evidence suggesting that a tool was used to perform this operation."  *Id.* at 5.

### E.      Procedural History

Presently before the Court are the following motions: (1) Plaintiffs' Motion for Sanctions[12] (ECF Nos. 52–53); (2) Defendants' Motions for Summary Judgment (ECF Nos. 76–77, 86); and (3) Defendants' Motion to Strike (ECF No. 85).  Plaintiffs oppose the Motions for Summary Judgment and to Strike (ECF Nos. 80, 87).  The Court held oral argument on July 19, 2021.  *See* ECF No. 88.  We focus first on summary judgment before turning to the other motions.

## II.      MOTION FOR SUMMARY JUDGMENT

### A.      Standard

Summary judgment is properly granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a). Facts are material if they "might affect the outcome of the suit under the governing law." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute as to those facts is genuine

---

[12]      Defendants did not file a formal brief in opposition.  They instead responded in a series of letters.  *See* Letter, ECF No. 63; Letter, ECF No. 67.

if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson*, 477 U.S. at 248).  "We view all the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Id.* (internal quotation marks and citation omitted).

The party moving for summary judgment must first "identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  In response, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).  "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252); *see also Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) ("In this respect, summary judgment is essentially 'put up or shut up' time for the non-moving party . . . .").

## B. Defendants' Arguments

Defendants' Motions for Summary Judgment effectively double as backdoor motions in limine.[13]  That is, they ask that we exclude evidence concerning Plaintiffs' damages and grant summary judgment on that basis.  *See, e.g.*, Def.'s Mem. Summ. J. 6, ECF No. 77-2; Def.'s Mem. Summ. J. 3–4, ECF No. 76-1.

---

[13]     Indeed, Comstock's motion is styled as a "Motion for Summary Judgment *and to Exclude* Undisclosed Damages, Trade Secret, and Expert Evidence."  Def.'s Mot. Summ. J. 1, ECF No. 77 (emphasis added).

Relevant here are Federal Rules of Civil Procedure 26 and 37.  Rule 26 requires a plaintiff to disclose "a computation of each category of damages" plus "the documents or other evidentiary material . . . on which each computation is based."  FED. R. CIV. P. 26(a)(1)(A)(iii).[14]  Rule 37 outlines the consequences for failing to comply with Rule 26: "If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is **not allowed to use that information . . . at trial**, unless the failure was substantially justified or is harmless."  FED. R. CIV. P. 37(c)(1) (emphasis added).  "In addition to or instead of this sanction," the court may (1) "order payment of the reasonable expenses, including attorney's fees, caused by the failure"; (2) "inform the jury of the party's failure"; and (3) "impose other appropriate sanctions," including dismissal of the action.  FED. R. CIV. P. 37(c)(1)(A)–(C).

"Rule 37 is written in mandatory terms, and is designed to provide a strong inducement for disclosure of Rule 26(a) material."  *Aetna Inc. v. Mednax, Inc.*, No. 18-2217, 2021 WL 949454, at *4 (E.D. Pa. Mar. 12, 2021) (quoting *Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.*, 60 F.3d 153, 156 (3d Cir. 1995)).  Nevertheless, a party can overcome this "automatic sanction," FED. R. CIV. P. 37 advisory committee's note to 1993 amendment, by showing "that a Rule 26 contravention was 'substantially justified or . . . harmless.'"  *Aetna*, 2021 WL 949454, at *4 (citing *Lamb v. Montgomery Twp.*, 734 F. App'x 106, 110 (3d Cir. 2018)).

Third Circuit courts must consider five factors before excluding evidence for failure to comply with Rule 26: "(1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent

---

[14]     Rule 26 also imposes a continuing duty to supplement these disclosures "in a timely manner if the party learns that in some material respect the disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  FED. R. CIV. P. 26(e)(1)(A).

to which allowing the evidence would disrupt the orderly and efficient trial of the cases or other cases in the court; [] (4) bad faith or willfulness in failing to comply with a court order or discovery obligation; and, (5) the importance of the evidence to the proffering party." *Id.* (internal quotation marks and citations omitted).

"[E]xclusion of critical evidence is an extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." *Konstantopoulos v. Westavco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997) (internal quotation marks and citations omitted); *see also ABB Air Preheater, Inc. v. Regenerative Env't Equip. Co., Inc.*, 167 F.R.D. 668, 671 (D.N.J. 1996) ("The Third Circuit has, on several occasions, manifested a distinct aversion to the exclusion of important testimony absent evidence of extreme neglect or bad faith on the part of the proponent of the [evidence]." (citations omitted)).  That being said, "[e]ven if there is no evidence of bad faith, where an oversight is not rationally explained and is surely prejudicial, exclusion is appropriate." *Aetna*, 2021 WL 949454, at *4 (internal quotation marks and citation omitted); *see, e.g.*, *Mercedes Benz USA LLC v. Coast Auto. Grp. Ltd.*, No. 99-3121, 2008 WL 4378294, at *5 (D.N.J. Sept. 23, 2008) ("Strategic manipulation of the discovery process, especially with regard to such critical disclosures as the theory of damages is the ill toward which Rule 26 and Rule 37 are aimed." (citing *Tarlton v. Cumberland Cnty. Corr. Facility*, 192 F.R.D. 165, 168–69 (D.N.J. 2000))).

Defendants ask that we exclude "any lost profits evidence . . . that was not properly disclosed during discovery."  Def.'s Mem. Summ. J. 19, ECF No. 77-2.  This would effectively mandate summary judgment.  In support of their argument, Defendants describe Plaintiffs' conduct during discovery.  Below is a timeline of the relevant events.

14

i.      *Plaintiffs' Initial Disclosures*

In their initial disclosures, Plaintiffs described their damages as "lost profits from business which Mr. Buzan unlawfully diverted to Comstock," plus damages "due to" Buzan's invasion of Naples' privacy.  App. vol. 2, 277.  As to the former, Plaintiffs were "**unable to calculate [their] damages** . . . because [they were] not fully aware of all of the business that [they] lost due to Mr. Buzan's unlawful acts."  *Id.* (emphasis added).  As to the latter, Plaintiffs noted that "damages for the invasion of . . . privacy is [*sic*] not quantifiable but must be determined by a jury."  *Id.*  Plaintiffs never supplemented their initial disclosures.  DSOF ¶ 61.  This conduct, Defendants contend, violates Rule 26.  *See* Def.'s Mem. Summ. J. 3–4, ECF No. 77-2; *see also Gomez v. Markley*, No. 07-868, 2011 WL 112886, at *2 (W.D. Pa. Jan. 13, 2011) ("[T]o fulfill the initial disclosure requirement, a party must provide a computation supported by documents." (citation omitted)); *Stemrich v. Zabiyaka*, No. 1:12-cv-1409, 2013 WL 4080310, at *1 (M.D. Pa. Aug. 13, 2013) ("[S]imply reciting a dollar figure clearly is not enough." (citations omitted)).

ii.      *Documentary Discovery*

In their first set of interrogatories, Defendants asked Plaintiffs to identify the type and amount of their damages.   App. vol. 2, 184.   Plaintiffs did not respond; instead, they "incorporate[d] by reference the settlement demand previously submitted to Defendants."  *Id.* at 198.  That settlement demand acknowledged "lost profits" in the amount of $200,000.[15]  *Id.* at 279. Plaintiffs never supplemented their interrogatory response.  DSOF ¶ 64.

Defendants then submitted additional interrogatories to Plaintiffs, requesting a detailed

---

[15]      The demand letter also states that "[n]othing said in this letter may be used in evidence for any purpose."  App. vol. 2, 279.

breakdown of damages.  App. vol. 2, 233; *see also* DSOF ¶ 65.[16]  Plaintiffs only responded after

a motion to compel.  *See* DSOF ¶ 77.  REACT answered that while it "has not yet determined [its]

entire and complete financial damages," it "asserts damages in excess of $1,297,227.00."  App.

vol. 2, 258–59.  REACT also directed Defendants to the following chart (App. vol. 3, 330, ECF

No. 78-3) that was produced in discovery:

| REACT'S LOSS REVENUE TO COMSTOCK LEDGER | | | | |
| --- | --- | --- | --- | --- |
| PROJECT NO: | PROJECT NAME: | REACT DOC NO: | DEFENDANT DOC NO: | LOSS REVENUE VALUE |
| 10564.200.00 | Riverside Terrace | REACT 004732-004735 | DEFENDANT 000184-000187 | $   102,600.00 |
| 10564.200.00 | Riverside Terrace | REACT 004741-004745 | DEFENDANT 000175-000179 | $   257,400.00 |
| 10564.200.00 | Riverside Terrace | REACT 004763-004767 | DEFENDANT 000163-000167 | $   650,623.00 |
| 10564.200.0 | Riverside Terrace | | DEFENDANT 000170-000173 | $     40,000.00 |
| 10564.200.00 | Riverside Terrace | | DEFENDANT 000188-000189 | $     13,333.00 |
| 12043.210.01 | 3705-3725 North Broad | REACT 004763-004767 | DEFENDANT 000311-000314 | $       2,250.00 |
| 10141.130.02 | 2015-2077 Ridge Ave | REACT 004779-004783 | DEFENDANT 000317-000321 | $     63,896.00 |
| 10141.130.02 | 2015-2077 Ridge Ave | REACT 004819-004830 | DEFENDANT 000304-000307 | $            - |
| 10827.200.02 | 956 East Erie Ave | REACT 004775-004777 | DEFENDANT 000322 | $     10,000.00 |
| 09246.200.01 | 1221 Chestnut Street | REACT 004811-004818 | DEFENDANT 000323-00349 | $   157,125.00 |
| | | | Total Loss | $ 1,297,227.00 |

Defendants correctly highlight that the above chart displays lost *revenue*—not lost *profits*.[17]

They then note that "[l]ost revenue is not a damage," and that "[p]arties can only recover net lost

profits."  Def.'s Mem. Summ. J. 8, ECF No. 77-2.  Plaintiffs do not dispute this point.  *See* Pls.'

Mem. 13, ECF No. 80 ("It is, of course, true that revenue is not a proper measure of damages.").

---

[16]     Specifically, Defendants "requested that REACT provide the amount of damages being sought for each count; the method of calculation for each element of damages; the basis for claiming that each category of damages were caused by the defendants; to the extent any lost revenue was sought, the identity of any current or former REACT clients that caused such loss (including the name of the lost project and amount of money related to each project); and all documents related to such damages."  DSOF ¶ 65.

[17]     Defendants also demonstrate that several of the documents identified in the "REACT DOC NO" column do not substantiate the accompanying lost revenue values.  DSOF ¶ 80.

### iii.     Deposition Testimony

Naples testified as REACT's Rule 30(b)(6) witness, but he could not articulate the company's damages.  Noting that he was perhaps "unprepared," he testified that, "to give you a hard number is really not possible at this time."  App. vol. 1, 27, 30; *see also id.* at 30–31 ("So the actual monetary damages are not, they're not easy to calculate.  They're not set.").

Naples also alleged that REACT lost business from three clients—Roizman, Winneg, and Shift Capital—but could only identify one specific lost project, the Roizman Project.  *Id.* at 26–27.  Naples offered to file a "supplemental" with further detail on these topics, but never did so. *Id.* at 30, 33; *see also* DSOF ¶ 70.

### iv.     Summary

As a result, Defendants argue that "REACT has **never disclosed**: (1) a lost profit calculation (or any damages calculation), (2) categories of damages (aside from REACT's lost profits), (3) quantity of damages for each category, count, or defendant, (4) its saved expenses or costs, or (5) the alleged actions which caused damages."  Def.'s Mem. Summ. J. 6, ECF No. 77-2 (emphasis added); *see also* Def.'s Reply Mem. Summ. J. 6, ECF No. 86 ("Plaintiffs never disclosed their damages theory, their calculation of damages, or any supporting evidence.").

### C.     Plaintiffs' Arguments

Plaintiffs vigorously dispute Defendants' argument.  In its counterstatement of facts, REACT asserts that it "timely disclosed its theory of damages in its Complaint and in its Rule 26 disclosures as including the ***illicit profit which Comstock had made*** on business it acquired by trading on REACT's trade secret[s] and confidential information obtained from Buzan."  PRSOF ¶¶ 58–70 (emphasis added).  Importantly, REACT is *not* saying that it disclosed its *own* lost profits—rather, it is reorienting its damages theory around a disgorgement of *Comstock's profits*.

*See* Def.'s Reply Mem. Summ. J. 6 (recognizing that Plaintiffs invoked "a brand-new theory [of damages]: disgorgement of Comstock's profit on the Roizman Project").

REACT nevertheless claims that it raised, and then substantiated, this disgorgement theory in both the Complaint and during Buzan's deposition.  PRSOF ¶¶ 58–70.  Indeed, the Complaint repeatedly requests "[d]amages or disgorgement in the amount that Defendants have been unjustly enriched," *see, e.g.*, Compl. ¶ 33(c), and Buzan estimated that Comstock's profit on the Roizman Project was "[o]ver $100,000, under $200,000."  Pls.' Mem. Ex. B, at 135, ECF No. 80-1.

**D.      Discussion**

With the parties' arguments in mind, we now turn to the case law cited by the parties.  Third Circuit courts have granted motions in limine to exclude damages evidence.  For example, in *Young v. Pleasant Valley School District*, plaintiffs disclosed documents supporting certain damages one month before trial.  No. 3:07-cv-854, 2011 WL 1485648, at *1 (M.D. Pa. Apr. 19, 2011); *see* Def.'s Mem. Summ. J. 6–7, ECF No. 77-2 (discussing *Young*).  Defendants accordingly sought to exclude testimony on these categories of damages.  *Young*, 2011 WL 1485648, at *1.  The court granted the request, finding that plaintiffs' conduct violated Rule 26.  *Id.*  It further noted that "[f]ailing to quantify—or even identify—categories of damages until the eve of trial impedes the opposing party's ability to place a reasonable estimated value on the case and creates the danger of trial by ambush."  *Id.* at *2.

Defendants here are not seeking exclusion of *particular* documents or testimony, so *Young* is not exactly analogous.  Rather, Defendants ask that we exclude "*any* lost profits evidence," which is a much broader request.  Def.'s Mem. Summ. J. 19, ECF No. 77-2 (emphasis added).

Nevertheless, *Szusterman v. Amoco Oil Co.*, offers support for Defendants' request.  112 F. App'x 130 (3d Cir. 2004); *see* Def.'s Mem. Summ. J. 7, ECF No. 77-2 (citing *Szusterman*).

There, plaintiff "failed to provide [defendant] with the basis for his damage claims or experts' valuations of the alleged damages." *Szusterman*, 112 F. App'x at 131.  Despite repeated requests from defendant, plaintiff "did not furnish *any facts or methodology based on which he calculated his alleged damages*." *Id.* (emphasis added).  On these facts, defendant moved to preclude plaintiff "from offering evidence concerning damages and requested summary judgment." *Id.*  The District Court granted the motion and dismissed the case, and the Third Circuit affirmed. *Id.* at 131–32. The Third Circuit agreed that plaintiff's "failure to provide required information was not only unjustified, but was prejudicial to [defendants]." *Id.* at 132.

*Aetna Inc. v. Mednax, Inc.* provides similar guidance.  *See* 2021 WL 949454; *see also* Def.'s Mem. Summ. J. 7, ECF No. 77-2 (discussing *Aetna*).  There, after fact discovery closed, plaintiff submitted the report of its damages expert.  2021 WL 949454, at *1.  The report offered two damages theories: (1) the amount that plaintiff overpaid defendant due to defendant's overbilling; and (2) the amount that plaintiff overpaid third party hospitals due to defendant's overbilling. *See id.* at *2.  Defendant moved to strike the second damages theory because plaintiff "fail[ed] to timely disclose that it was seeking damages for the amounts it paid to hospitals" and "repeatedly denied during fact discovery that it sought such recovery." *Id.*  The District Court granted defendant's motion and precluded plaintiff "from introducing evidence in support of any recovery of hospital payments." *Id.* at *7.  It emphasized that plaintiff "has not explained why its failure to timely disclose that it sought to recover damages for hospital payments was harmless nor provided a substantial justification for why it failed to disclose this information." *Id.* at *5.  For example, neither the complaint[18] nor plaintiff's initial disclosures "specified that [plaintiff] sought

---

[18]     The *Aetna* complaint made a passing reference to "inflated payments to hospitals."  *See Aetna*, 2021 WL 949454, at *1.  This mirrors the passing references to "disgorgement" in the instant Complaint. *See, e.g.*, Compl. ¶ 33(c).

to recover hospital payments." *Id.*  And plaintiff's 30(b)(6) witness "did not testify that [plaintiff] sought to recover hospital payments." *Id.* at *8.[19]

This case law suggests that Plaintiffs should be precluded from introducing evidence on either their initial lost profits theory of damages or their new disgorgement theory.  Plaintiffs' initial disclosures, interrogatory responses, and 30(b)(6) testimony undoubtedly fall short and were never supplemented.  We therefore turn to the five factors that must be considered before excluding evidence for failure to comply with Rule 26.  *See Aetna*, 2021 WL 949454, at *4; *see also Nicholas v. Pa. State Univ.*, 227 F.3d 133, 148 (3d Cir. 2000); *Hill v. TD Bank, NA*, 586 F. App'x 874, 879 (3d Cir. 2014).  With one exception, they each support the exclusion of damages evidence here.

---

[19]     Defendants cite two additional cases as persuasive authority.  *See* Def.'s Mem. Summ. J. 7–8, ECF No. 77-2.  Both share factual similarities with the instant case.  In *Brandt Indus., Ltd. v. Pitonyak Mach. Corp.*, the court precluded defendant "from presenting evidence or arguments at trial concerning specific computation of its alleged damages."  No. 1:10-cv-0857, 2012 WL 4027241, at *2 (S.D. Ind. Sept. 12, 2012).  There, defendant's initial disclosures stated that defendant "has no damages computations or supporting documents at this time." *Id.* (internal quotation marks omitted).  Defendant never "supplemented its Rule 26(a) disclosures or identified any damage computations or supporting documents following the submission of its initial disclosures." *Id.*  And the defendant's 30(b)(6) witness "did not set forth any specific damage computations supported by documentary evidence." *Id.*

Similarly, in *Veritas Operating Corp. v. Microsoft Corp.*, defendant "never provided . . . a computation or an explanation of its [damages] theory" for its counterclaim.  No. 2:06-cv-00703, 2008 WL 657936, at *6 (W.D. Wash. Jan. 17, 2008).  Plaintiff accordingly sought to bar defendant from seeking damages. *Id.*  The court sided with plaintiff and prevented defendant from submitting "any evidence regarding any computation for damages . . . whether via motion or at trial." *Id.* at *26 (internal quotation marks omitted).  Defendant did not dispute that it failed "to provide any computation of damages or any other damages analysis." *Id.* at *25.  Rather, it argued that it would prove damages through testimony of its expert witness. *Id.*  This argument was unavailing and did not "cure [defendant's] failure to disclose any computation of damages or any other damages analysis as required by the rules." *Id.*  And because defendant was precluded from introducing damages evidence, the court entered summary judgment for plaintiff. *Id.* at *34; *see also Veritas Operating Corp. v. Microsoft Corp.*, No. C06-0703-JCC, 2008 WL 687116, at *1 (W.D. Wash. Mar. 11, 2008) (confirming entry of summary judgment for plaintiff).

          i.       *Prejudice or surprise of the party against whom the excluded evidence would have been admitted*

Defendants have been prejudiced by Plaintiffs' discovery shortcomings. They correctly note that "[a]ny evidence on damages will prejudice Defendants because Plaintiffs failed to disclose those amounts in their Complaint, in their Initial Disclosures, or in discovery." Def.'s Mem. Summ. J. 6, ECF No. 77-2; *see also* Def.'s Reply Mem. Summ. J. 8. As to the new disgorgement theory, "CDS has received no discovery on this theory, was afforded no opportunity to obtain an expert to opine on it, could not rebut it, and still does not know how Plaintiffs calculate damages." Def.'s Reply Mem. Summ. J. 8. And as to the lost profit theory, Plaintiffs' ultimate estimate of $1,297,227 stems from a chart showing lost *revenue*—not lost *profit*. *Id.* at 7; *see also Power Restoration Int'l, Inc. v. PepsiCo, Inc.*, No. 12-1922, 2015 WL 1208128, at *4 (E.D. Pa. Mar. 17, 2015) ("Although lost profits need not be established with mathematical certainty, they must be established with a fair degree of probability." (internal quotation marks and citation omitted)).[20]

---

[20]     Buzan's estimation that Comstock received "[o]ver $100,000, under $200,000" in profits from the Roizman Project also does not cure Plaintiffs' discovery failings. Pls.' Mem. Ex. B, at 135, ECF No. 80-1. Plaintiffs characterize this evidence as "*fact* testimony" probative of REACT's lost profits and sufficient to survive summary judgment. Pls.' Mem. 11, ECF No. 80 (emphasis in original). This argument strains credulity. First, Buzan acknowledged that he did not have the "forensics" of the deal and was merely approximating its profit value. Pls.' Mem. Ex. B, at 135, ECF No. 80-1; *see also id.* at 136 ("I didn't do foresnics to know what our costs on every job were for Roizman."). Second, and perhaps most importantly, Plaintiffs miss the point: even if this was rock solid testimony, Plaintiffs never disclosed that they were calculating *their* lost profits damages by way of the profits that *Comstock* received for the Roizman Project. Plaintiffs state that Defendants "had ample notice" of this theory—but Plaintiffs never supplemented their initial disclosures or interrogatory responses to make that clear. As Plaintiffs acknowledge, "[t]he types of evidence that can be used to prove lost profits include past profits in an established business, profits made by competitors, and expert opinion." Pls.' Mem. 7, ECF No. 80 (citing *Mass. Bonding & Ins. Co. v. Johnston & Harder, Inc.*, 22 A.2d 709, 714 (Pa. 1941)). Only now, in their summary judgment opposition briefing, do Plaintiffs indicate how they intend to prove lost profits. We cannot countenance this dilatory conduct.

ii.     *The ability of the party to cure that prejudice*

Plaintiffs cannot cure prejudice "without reopening fact discovery, but fact discovery has long since closed." *Aetna*, 2021 WL 949454, at *6. As in *Aetna*, reopening discovery would be inappropriate here because it "would expose [Defendants] to substantial expense as it revisits discovery requests." *Id.*

iii.    *The extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court*

For the same reason discussed with reference to the second factor, this third factor also supports exclusion. *See id.* (collapsing second and third factors into a single inquiry). Reopening discovery to allow further investigation into Plaintiffs' damages would undoubtedly have a disruptive effect, as trial is scheduled to begin in less than two months.

iv.     *Bad faith or willfulness in failing to comply with a court order or discovery obligation*

Plaintiffs do not offer a "reasonable explanation for [their] failure to disclose [their] calculation of damages." *Mercedes Benz*, 2008 WL 4378294, at *4. "At worst," this suggests bad faith; "at best, it was a willful strategic decision." *Id.*; *see also Tarlton*, 192 F.R.D. at 169 ("Litigants are warned not to indulge in gamesmanship with respect to the disclosure obligations." (internal quotation marks and citation omitted)).

v.      *The importance of the evidence to the proffering party*

This element weighs heavily in Plaintiffs' favor. *Cf. ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 299 (3d Cir. 2012) ("[W]ithout additional damages calculations, it is clear that Plaintiffs will be unable to pursue damages . . . .").[21]

---

[21]     Evidence of Plaintiffs' damages is no less important to Defendants, who must defend against allegations that they were unjustly enriched by the misappropriation of trade secrets.

> vi. *We will grant summary judgment on Count I because Plaintiffs cannot prove damages*

On balance, these factors point toward the exclusion of damages evidence—whether propounded in support of Plaintiffs' original lost profits theory or their new disgorgement theory. Still, we must determine whether Plaintiffs' discovery failure "was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1).

Plaintiffs contend that its conduct meets this standard because disclosure of "Comstock's ill-gotten profit . . . was not possible until Buzan was deposed and, therefore, any delay in informing Defendants of REACT's damage claim was 'substantially justified.'  For the same reason, Defendants were not harmed by any delay as their profit on such business was always known to them." Pls.' Mem. 10–11, ECF No. 80.  This argument proves too much.  If accepted, then a plaintiff could merely plead disgorgement, fail to specify any facts or a methodology that substantiate those damages, and then, on the eve of trial, claim that its conduct is harmless because defendants "always know[]" the extent of their supposedly ill-gotten gains.

Without proof of damages, Plaintiffs' sole federal claim cannot survive summary judgment.[22]

> vii. *Summary judgment is also appropriate on Count I because Plaintiffs have not identified any trade secrets*

We note that the federal Defend Trade Secrets Act also provides for injunctive relief, *see* 18 U.S.C. § 1836(b)(3)(A), and Plaintiffs request "[t]emporary, preliminary and permanent injunctive relief." Compl. ¶ 33(f).  The parties do not discuss the possibility of injunctive relief.

---

[22] In Count I, Plaintiffs allege that Buzan and Comstock violated the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.  "Regarding remedies, under the federal Defend Trade Secrets Act this Court may award damages based on actual losses or unjust enrichment." *T.H. Glennon Co. v. Monday*, No. 18-30120-WGY, 2020 WL 1270970, at *16 (D. Mass. Mar. 17, 2020) (citing 18 U.S.C. § 1836(b)(3)(B)).

In any event, such relief would be unavailable, as Plaintiffs' federal claim fails for another reason: Plaintiffs have not identified any trade secrets.  *See* Def.'s Mem. Summ. J. 15, ECF No. 77-2.

To establish a violation of the Defend Trade Secrets Act (DTSA), a plaintiff must prove: "(1) the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret; (2) that is related to a product or service used in, or intended for use in, interstate or foreign commerce; and (3) the misappropriation of that trade secret, defined broadly as the knowing improper acquisition, or use or disclosure of the secret." *Oakwood Laboratories LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021) (internal quotation marks and citations omitted).  "[A] protected trade secret [is] information that: (a) the owner has taken reasonable means to keep secret; (b) derives independent economic value, actual or potential, from being kept secret; (c) is not readily ascertainable by proper means; and (d) others who cannot readily access it would obtain economic value from its disclosure or use." *Freedom Med. Inc. v. Whitman*, 343 F. Supp. 3d 509, 518–19 (E.D. Pa. 2018) (internal quotation marks and citations omitted).

Plaintiffs "only particularized the Roizman [Project] proposal as a trade secret."  Def.'s Mem. Summ. J. 16, ECF No. 77-2; DSOF ¶ 54 ("REACT's alleged trade secrets are thus limited to the Roizman [Project] Proposal.").  Indeed, Plaintiffs do not dispute this point in their counterstatement of facts.  *See* PRSOF ¶¶ 40–57.

The problem for Plaintiffs is that they did not maintain the secrecy of the proposal; instead, they "disclosed it to Roizman—and Roizman was under no restrictions against its use."  Def.'s Reply Mem. Summ. J. 12; *see* DSOF ¶¶ 55–57; *see also Nat'l Risk Mgmt., Inc. v. Bramwell*, 819 F. Supp. 417, 432 (E.D. Pa. 1993) (holding that "information . . . freely given out to prospective clients" is not a trade secret).

Plaintiffs attempt to reframe the issue.   Whereas Defendants characterize the Roizman Project proposal as consisting of pure pricing information, *see* Def.'s Mem. Summ. J. 17, ECF No. 77-2, Plaintiffs emphasize "that it took REACT months and that REACT incurred costs to acquire the information necessary to prepare the . . . proposal."  PRSOF ¶¶ 40–57.  This is a distinction with a difference, as the Third Circuit "has distinguished between pure pricing information, readily obtainable from other sources, and proprietary pricing formulae derived from a 'range of data relat[ed] to materials, labor, overhead, and profit margin,' which is entitled to protection as a trade secret."  *Freedom Med.*, 343 F. Supp. 3d at 519 (quoting *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1260 (3d Cir. 1985)); *see also Nat'l Risk Mgmt.*, 819 F. Supp. at 431 ("[P]rotection has been extended to . . . the costing and pricing information of an employer's business plans . . . and the terms of specific customer accounts including contract expiration dates and revenues." (citation omitted)).

Judge Beetlestone explored this distinction in *Freedom Medical Inc. v. Whitman*, 343 F. Supp. at 518–20.  There, the plaintiff contended that "spreadsheets containing [its] pricing information constitutes a trade secret."  *Id.* at 518.  These "pricing schedules" were "the product of [plaintiff's] proprietary financial model" and "comprehensive budgeting process."  *Id.* at 520.  And while plaintiff's customers had access to "price information for a given product," they did *not* "have access to the compiled pricing information organized into readily accessible spreadsheets."  *Id.*

On these facts, the pricing schedules were held to be protected trade secrets.  *Id.*  Judge Beetlestone emphasized the above-mentioned distinction: "pure pricing information is not protectable because that information is known to the customer, 'who has every right to disclose this information, if it so chooses, to inquiring competitors of the plaintiff.'"  *Id.* at 519 (quoting

*Tyson Metal Prod., Inc. v. McCann*, 546 A.2d 119, 122 (Pa. Super. Ct. 1988)).  By contrast, "the compilation of [pricing] information—its aggregation and organization into the spreadsheets" tends to receive trade secret protection, particularly where "the compilation of information is not readily obtainable from publicly available sources." *Id.* (quoting *Amerisourcebergen Drug Corp. v. Am. Associated Druggists, Inc.*, No. 05-5927, 2008 WL 248933, at \*25 (E.D. Pa. Jan. 29, 2008)); *see also Nat'l Risk Mgmt.*, 819 F. Supp. at 430 (recognizing trade secret status of "customer lists and customer information which have been compiled" by a firm because they "represent[] a material investment of employer's time and money" (quoting *Morgan's Home Equip. Corp. v. Martucci*, 136 A.2d 838, 842–43 (Pa. 1957))).

We find that the Roizman Project proposal is pure pricing information, and not a protectable compilation of information.  Unlike the documents in *Freedom Medical*, the proposal was already known and made available to Roizman, who had "every right to disclose this information" to Plaintiffs' competitors.  *Freedom Med.*, 343 F. Supp. 3d at 519 (internal quotation marks and citation omitted).  Indeed, "all clients to whom REACT provided proposals were free to use those proposals *however they chose*."  App. vol. 2, 105 (emphasis added); *see also* DSOF ¶ 55.  Plaintiffs do not dispute this point in their counterstatement of facts.[23]  *See* PRSOF ¶¶ 40–57.

---

[23]     Plaintiffs further emphasize that the "information necessary to prepare the . . . proposal," PRSOF ¶¶ 40–57, is a trade secret: "By stealing REACT's work, Comstock short circuited the time and expense that otherwise would have been required to submit a proposal to Roizman."  Pls.' Mem. 32, ECF No. 80.  To be sure, Buzan testified about the work that went into the proposal while he was a REACT employee: "I would have engaged with administration to produce the proposals.  I would have followed up with the client and had conversations about the proposals. . . .  Based on a separate request by somebody who represented the client, we took samples in one building to clarify whether the wall materials in the building were asbestos or not. . . .  So I believe as a separate consulting activity, we went into this building and resampled that to supplement the original survey performed by others."  Pls.' Mem. Ex. B, at 47, 52–53, ECF No. 80-1.  To a certain extent, this paints the proposal as "the product of a proprietary pricing formulae derived from a range of data relat[ed] to materials, labor, overhead, and profit margin."  *Freedom Med.*, 343 F. Supp. 3d at 520 (internal quotation marks and citation omitted).  But it does not change the

They instead reiterate, in a conclusory fashion and without citation to any documents or testimony, that "[a]ll of the information REACT acquired to make that proposal possible was the confidential and trade secret information of REACT."[24]  *Id.*; *see also PharMerica Corp. v. Sturgeon*, No. 2:16-cv-1481, 2018 WL 1367339, at *5 (W.D. Pa. Mar. 16, 2018) (granting summary judgment where plaintiff "failed to identify a single quality, attribute, or feature of any of the[] alleged trade secrets").

For these reasons, summary judgment is appropriate on Count I.  Having dismissed Plaintiffs' federal cause of action, we must decide whether to exercise supplemental jurisdiction over the remaining state law claims.  "A district court may decline to exercise supplemental jurisdiction over a state law claim where 'the district court has dismissed all claims over which it has original jurisdiction.'"  *Pahlavan v. Drexel Univ. Coll. of Med.*, 438 F. Supp. 3d 404, 428 (E.D. Pa. 2020) (quoting 28 U.S.C. § 1367(c)(3)).  Typically, when "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).  Given this guidance, we will decline to exercise supplemental jurisdiction over Plaintiffs' remaining claims.  They will be dismissed without prejudice.  *See Kach v. Hose*, 589 F.3d 626, 650 (3d Cir. 2009).

---

undisputed—and dispositive—fact that Roizman had "every right to disclose [the proposal] . . . to inquiring competitors of the plaintiff."  *Tyson Metal*, 546 A.2d at 122.

[24]    To that end, Defendants correctly note that "vague references to . . . information will not suffice" in identifying a trade secret.  *Advanced Fluid Sys., Inc. v. Huber*, 381 F. Supp. 3d 362, 386 (M.D. Pa. 2019) (citing *Synygy, Inc. v. ZS Assocs.*, No. 07-3536, 2013 WL 3716518, at *2 (E.D. Pa. July 15, 2013)); *see also* Def.'s Mem. Summ. J. 16, ECF No. 77-2.

### III.    MOTION TO STRIKE

#### A.    Standard

Courts "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f); *see also Readmond v. Matsushita Elec. Corp. of Am.*, 355 F. Supp. 1073, 1080 (E.D. Pa. 1972) (striking a "new allegation" in "plaintiff's answer to defendant's motion for summary judgment"). For purposes of Rule 12(f), "scandalous matter is that which casts a derogatory light on someone, uses repulsive language, or detracts from the dignity of the court." *Roamingwood Sewer & Water Ass'n v. Nat'l Diversified Sales, Inc.*, 509 F. Supp. 3d 198, 204 (M.D. Pa. Dec. 21, 2020) (internal quotation marks and citations omitted). Motions to strike "are not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues." *Chan v. Barbour, Inc.*, 263 F. Supp. 3d 521, 524 (E.D. Pa. 2017) (internal quotation marks and citation omitted).

#### B.    Discussion

Defendants argue that language in Plaintiffs' opposition briefing is scandalous. Def.'s Mot. to Strike 7, ECF No. 85-1. The language at issue relates to Thompson's declaration, in which he affirms that "Naples stated under oath in the verified complaint that the [Agreement] was void *ab initio*." App. vol. 2, 157. After including this quote in their briefing, Plaintiffs allege the following:

> It gives Plaintiffs and their counsel no pleasure to attack the veracity of another lawyer, but Jubal Thompson is not, and cannot be, telling the truth for the simple reason that nowhere in the "verified complaint" in the "State Lawsuit," does Mr. Naples state that the Stockholders' Agreement is void *ab initio*. Rather, as noted above, it is only in the *ad damnum* clause in *one* count of that multi-count Complaint where the court is asked to *find* that the Stockholders' Agreement is void and then, only as an alternative form of relief.

28

> Clearly, Mr. Thompson never reviewed the Complaint in the state
> court action.  Someone told him what to put in his Declaration and
> that someone got it *very* wrong.  Whether the Court thinks it proper
> to act anent Mr. Thompson (and whoever advised him to submit a
> knowingly false Declaration[]) at a minimum, it should give no
> credence to *anything* contained within his Declaration under the
> maxim *Falsas in Unum, Falsas in Omnibus* which is precisely the
> instruction that is given to every jury.

Pls.' Mem. 16–17, ECF No. 80.

To be sure, Plaintiffs merely asked the Pennsylvania state court to declare the Agreement

void *ab initio*—absent from the state court complaint are "any statement[s] of material *fact*" that

the Agreement is void.  Pls.' Mem. 17, ECF No. 80 (emphasis in original).  But that does not mean

that Thompson or Comstock's counsel committed perjury or misrepresented the nature of the state

court proceedings.[25]  "Plaintiffs literally state as fact that Mr. Thompson engaged in a criminal

offense (perjury) and that the lawyers advising him engaged in a criminal offense by suborning

such perjury."  Def.'s Mot. to Strike 7.  This is a bridge too far, so the language will be stricken.

## IV.     MOTION FOR SPOLIATION SANCTIONS

### A.     Standard

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve

property for another's use as evidence in pending or reasonably foreseeable litigation."  *Bistrian

v. Levi*, 448 F. Supp. 3d 454, 464 (E.D. Pa. 2020) (quoting *Paramount Pictures Corp. v. Davis*,

234 F.R.D. 102, 110 (E.D. Pa. 2005)).  Where, as here, parties allege spoliation of ESI, Federal

Rule of Civil Procedure 37(e) applies.  *See id.*  "Rule 37(e) provides that spoliation occurs where

ESI 'that should have been preserved in the anticipation or conduct of litigation is lost because a

party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through

---

[25]     Recall that Naples, in his deposition for the state court litigation, maintained that the "all of the terms [of the Agreement] are void."  App. vol. 1, 79–80.

additional discovery.'" *Id.* at 465 (quoting FED. R. CIV. P. 37(e)).  If we find spoliation, we then

"determine what sanction to impose." *Id.* at 466 (citing *Bull v. United Parcel Serv., Inc.*, 665 F.3d

68, 73 n.5 (3d Cir. 2012)).

### B.   Discussion

At the outset, we note that Plaintiffs do "not call upon the Court to impose any sanctions."

Pls.' Mem. 6, ECF No. 53.  Rather, Plaintiffs requested that we reopen discovery to investigate:

(1) Buzan's alleged failure to produce all the devices specified in our November 2020 order;[26] and

(2) allegations that the operating system on Buzan's Comstock-issued laptop had been overwritten.

*See* Pls.' Mot. for Sanctions 4, ECF No. 52.

To the extent that Plaintiffs' motion seeks additional discovery, it is denied as moot.

Indeed, we allowed Plaintiffs to serve additional interrogatories on these issues and directed further

forensic investigation by the neutral expert.

As a result of this investigation, we are also satisfied that spoliation sanctions would be

inappropriate.  Buzan affirmed that he did "not place or store any business information" on the

remaining USB devices that were identified in the Maragell Report but not produced for additional

forensic inspection.  Buzan Aff. ¶¶ 6, 10, ECF No. 66-1.  Likewise, the Second Walker Report

found no "evidence that suggested that [Buzan] initiated the [operating system] updates" on his

Microsoft Surface laptop.  Pls.' Mem. Ex. S, at 3, ECF No. 80-2.  Walker also "analyzed the laptop

in order to identify any evidence of file wiping or data destruction" and "did not observe any

---

[26]    We ordered Defendants to "make available to such expert for forensic copying and evaluation, each and every smart phone, cell phone, desktop computer, laptop computer, electronic notebook and electronic data storage device . . . which at any time . . . Buzan . . . owned or used, for business purposes, during his employment with REACT . . . and/or his employment with CDS . . . and on which he placed or stored any business information, including, without limitation, telephone numbers and/or contact information of customers and potential customers of REACT." Order 1–2, ECF No. 38.

evidence suggesting that a tool was used to perform this operation." *Id.* at 5.  An "evidentiary hearing to determine if and what sanctions should be imposed" is therefore unnecessary.  Pls.' Mem. 6, ECF No. 53.

## V.   CONCLUSION

Language in Plaintiffs' summary judgment opposition briefing is scandalous, so it will be stricken.   Further, we decline to enter sanctions for Defendants' alleged spoliation of ESI.  Finally, Plaintiffs have not complied with Rule 26, so evidence of their damages is excluded.  Plaintiffs have also failed to identify any trade secrets.  For these reasons, summary judgment is warranted on Plaintiffs' sole federal claim.  Because we will grant summary judgment on this claim, we decline to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims.  Those claims are dismissed without prejudice.

An appropriate order follows.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge